UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA GREER

                Plaintiff,                        Case No. 06-12192

vs.                                      DISTRICT JUDGE MARIANNE O. BATTANI
                                          MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**

I.     **BACKGROUND**

      Sandra Greer brought this action under 42 U.S.C. §405(g) to challenge a final decision of

the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II

of the Social Security Act.  Both parties have filed motions for summary judgment, which have

been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, **IT IS**

**RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the

Commissioner's motion for summary judgement **GRANTED**.

     A.     <u>Procedural History</u>

      Plaintiff protectively applied for DIB in February 2003 (R. 70-72), alleging that she

became disabled February 22, 2002, due to bilateral carpal tunnel syndrome, depression, and

stress (R. 70, 77, 252).[1]  After Plaintiff's claim was initially denied (R. 53-58),[2] a hearing was

held on July 11, 2005, before Administrative Law Judge Daniel G. Berk (ALJ) (R. 247-266).

Plaintiff was represented by Attorney Beatrice B. Logan and Vocational Expert Elaine M. Tripi,

Ph.D., (VE) also testified (R. 261-264).

In an August 16, 2005, decision ALJ Berk concluded that Plaintiff was not under a

disability as defined by the Act because she remained capable of performing a significant

number of jobs existing in the economy (R. 26-36).[3]  On March 17, 2003, the Appeals Council

denied Plaintiff's request for review (R. 5-7).

B.    **Background Facts**

1.    ***Plaintiff's Hearing Testimony***

Plaintiff was 49 years old, 5'4" tall and right handed at the time of the hearing (R. 252-

253).  She finished the twelfth grade and had completed a few courses at Wayne Community

College (R. 254).  Plaintiff was married and had no dependent children (R. 253).

She began receiving a disability pension in 2002 from the Bud Company.  Plaintiff also

---

[1] Plaintiff amended her onset of disability date at the administrative hearing (R. 252).

[2] Pursuant to procedures being tested as part of a disability redesign prototype, Plaintiff's claim was not subject to the reconsideration step of the administrative review process. *See* 20 C.F.R. §§ 404.900, 404.906(b)(4).

[3] Plaintiff previously filed an application for disability benefits on March 30, 2000, which was denied by the decision of ALJ Henry Perez, Jr. on August 30, 2001 (R. 45-52).  The Appeals Council declined to review the decision of the ALJ. The ALJ reviewing Plaintiff's current application determined that there was no good cause to re-open the prior decision (R. 27).  Thus, the principle of administrative *res judicata* forecloses examination of the time prior to September 1, 2001, and the presentation of the facts will concentrate on the time period relevant to this adjudication.

redeemed a Workers' Compensation claim on March 16, 2005, for a net of $67, 261 (R. 257).

Her last full time employment was with the Bud Company as a spot welder, a position she held from February 1986 until September 2000 (R. 254).

Plaintiff indicated that she could lift up to five pounds. She had difficulty sitting at least once a day, and standing "sometimes," but could not estimate how long she could stand (R. 254-55). Plaintiff testified she had problems with her knees, but did not elaborate.

Plaintiff had constant pain in her hands, which she treated with aspirin and Motrin three or four times a week (R. 255). She did not take Motrin more often because it upset her stomach. Plaintiff had not considered surgery for her hands because she was told it would not help her condition (R. 258). She had braces on her hands, but only used them while driving or "doing something." She had difficulty turning water faucets, but could dress herself, cook occasionally with assistance from her husband, and do a little house cleaning (R. 259).

Plaintiff testified that she was treated at Henry Ford for depression until her insurance changed, and continued to suffer from depression at the time of the hearing (R. 256, 261). She had crying spells, which could last the entire day and caused her to "feel down." Plaintiff had difficulty sleeping at night, and took a nap for two to three hours every day (R. 260).

### 2. *Medical Evidence - Physical*

In December 2000, Plaintiff underwent an electromyogram ("EMG") study performed by Parmod Mukhi, M.D. The test showed evidence of bilateral carpal tunnel syndrome, worse on the right than the left, but no evidence of right or left cervical radiculopathy or plexopathy (R. 146).

In February 2002, Ronald Rusko, M.D., a hand surgeon, examined Plaintiff. He noted

"variable" range of motion in the right wrist, ranging from 20 to 45 degrees, with the left wrist ranging from 55 to 70 degrees (R. 150). While Plaintiff exhibited diffuse tenderness in both wrists, Dr. Rusko found no evidence of tendinitis, or grinding or crepitation. Dr. Rusko found no evidence of swelling or unstable joints in either hand. Plaintiff exhibited intact motor function in the median and ulnar joints (R. 151). Dr. Rusko concluded that Plaintiff had not given a full effort during testing, as documented by the complete lack of grip strength in either hand, and the variable flexion in both wrists throughout examination. He indicated that Plaintiff should undergo a second EMG study, after which he would issue an addendum to his findings (R. 152).

In March 2002, Plaintiff underwent another EMG study, which Dr. Mukhi indicated was the same as the December 2000 study (R. 142). Based on these results, Dr. Rusko opined that Plaintiff should continue conservative treatment for carpal tunnel syndrome with medication, injections, and wrist splinting, and only seek surgical treatment if improvement did not occur. Dr. Rusko further opined that Plaintiff could "return to light work with the avoidance of any heavy pulling, pushing or lifting and also the avoidance of vibratory tools. It would also be recommended that the patient use protective wrist splints" (R. 147).

From January 2000 to September 2001, Ronald Little, M.D., an orthopedist, consistently noted that Plaintiff's carpal tunnel syndrome was aggravated by repetitive use of her hands, and that she should avoid such use (R. 206, 207, 209, 218). In July 2002, Dr. Little opined that Plaintiff would eventually need surgery, and switched her from Vioxx, an anti-inflammatory agent, to Vicodin, a pain reliever (R. 202). In October 2002, Dr. Little restricted Plaintiff from work involving vibrating tools, heavy lifting, pushing or pulling, and driving for long distances

(R. 199).  He indicated that she had to use wrist splints (R. 200).

In January 2003, Dr. Little stated that Plaintiff had "an inability to use her right hand" (R. 194).  He provided permanent restrictions against repetitive use of the hands, data entry, use of vibrating tools, working without splints, heavy lifting, or more than minimal driving.

In February 2003, Dr. Little wrote a letter stating that Plaintiff did not have "the ability to use her right hand unrestricted."  Dr. Little further stated that Plaintiff could drive for personal use, but not for a job that required driving throughout the day (R. 193).

On July 14, 2003, Plaintiff underwent a consultative examination performed by Bina Shaw, M.D (R. 221).  Plaintiff reported diabetes and hypertension for two years treated with medication.   She also reported being depressed and having pain in both knees due to arthritis. Dr. Shaw observed full muscle strength, normal reflexes, stable gait, and 20 pounds of strength. Plaintiff exhibited full range of motion in the wrists, hands, hips, knees, and ankles (R. 222).

In August 2003, Plaintiff's physical treatment records were reviewed by a state agency medical expert, who concluded that she retained the ability to perform light work, limited to occasional postural limitations, and no concentrated exposure to vibration (R. 114-20).

In March 2004, Dr. Rusko examined Plaintiff, and concluded that she had a "gross overreaction" to range of motion and grip strength testing (R. 232).  He indicated that he had recommended conservative treatment, including use of anti-inflammatory medication, cortisone injections, and wrist splinting, but that Plaintiff had not undertaken these treatments, aside from occasional splinting.  He recommended an updated EMG study.

The EMG study showed findings consistent with carpal tunnel syndrome, including neuropathy in both wrists, as well as more severe findings on the right side than the left (R.

227).  Based on these results, Dr. Rusko recommended surgery over conservative treatment.  He

restricted Plaintiff to work using wrist splints, no heavy lifting, pushing, or pulling, or use of

vibrating tools (R. 234).

On November 10, 2004, Plaintiff was examined by Jerry Taylor, D.O., an orthopedist (R.

242).  Dr. Taylor concluded that Plaintiff had carpal tunnel syndrome, worse on the right, and

tenosynovitis.  He advised limiting Plaintiff to light work that did not require repetitive or

forceful grasping, pushing, pulling, twisting, or use of vibrating tools.  He indicated she could

not lift more than 5 pounds in either hand, and that she should use wrist braces while working.

### 3. *Medical Evidence - Mental Impairments*

In July 2002, Plaintiff underwent an initial evaluation by Corina Velehorschi, M.D., a

psychiatrist.  Dr. Velehorschi noted no problems with attention or concentration (R. 186).  She

assigned Plaintiff a GAF score of 60, indicating moderate symptoms or moderate difficulty in

social, occupational, or school functioning (R. 187).[4] *See* DSM-IV at 34.  Yet, she noted

that Plaintiff's GAF score for the past twelve months had been 80, indicating less than mild

symptoms which were transient and expected.  In August 2002, Plaintiff exhibited normal

---

[4]   The GAF score is a subjective determination that represents "the clinician's judgment
of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC.,
DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at
30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or
others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death). *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in
reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or
major impairment in several areas such as work or school, family relations, judgment, thinking
or mood." *Id.*  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any
serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep
a job)."  *Id.*   A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or
occupational functioning. *Id.*

attention, and only mild problems with concentration (R. 183).

In February 2003, Plaintiff was examined by Adekunle Ajayi, M.D., a psychiatrist. Dr. Ajayi observed no problems with attention or concentration, and assigned Plaintiff a GAF score of 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning (R. 181-82). *See* DSM-IV at 34. In April 2003, Dr. Ajayi assigned Plaintiff a GAF score of 70, indicating only mild symptoms with generally good functioning. *See* DSM-IV at 34. Dr. Ajayi elaborated that Plaintiff's GAF score for the previous twelve months had been 70 as well (R. 174). At that time, Plaintiff exhibited no problems with attention or concentration (R. 176). In July 2003, Dr. Ajayi indicated that Plaintiff tolerated Paxil without side effects, and that her low-grade dysphoria was slowly resolving (R. 173).

In July 2003, Plaintiff's mental treatment records were reviewed by E.A. Czarnecky, Ph.D., a state agency psychologist. Dr. Czarnecky found that Plaintiff was moderately limited in the ability to: understand and remember detailed instructions; carry out short and simple instructions; maintain attention and concentration for extended periods; interact with the general public; and complete a normal workday and workweek without interruption from psychological symptoms and perform at a consistent pace without an unreasonable number of rest periods (R. 121-22).

Dr. Czarnecky noted that Plaintiff had "Dysthymia - partial remission" (R. 128). She concluded that Plaintiff had moderate limitations in activities of daily living and moderate difficulty in maintaining concentration, persistence, or pace, and mild limitation in social function (R 135).

7

<u>Medical Evidence Submitted After the August 16, 2005, decision to the Appeals Council</u>[5]

On November 16, 2005, Dr. Little submitted a report indicating that Plaintiff was his patient and was diagnosed as having bilateral carpel tunnel syndrome (R. 244). He opined that Plaintiff was getting progressively worse and would never return to gainful employment.

On November 21, 2005, Linda Bird, MSW, LMSW, RN, submitted a letter indicating that Plaintiff was being seen at Eastwood Clinics for outpatient mental health treatment (R. 245). She was first seen on September 9, 2005, had had 6 sessions at the time of the letter, and was continuing to be seen. Her diagnosis was major depression, recurrent, moderate.

On November 22, 2005, Mervin G. Wolff, M.D. submitted a report indicating Plaintiff suffered from a number of problems, including diabetes, bilateral carpel tunnel syndrome, hypertension, and bilateral arthritis in her knees (R. 246).

### 4. *Vocational Evidence*

VE Tripi described Plaintiff's past relevant work and defined her exertional and skill levels for these positions (R. 262-263). In addition to working as a spot welder, VE Tripi indicated that Plaintiff also worked as a visual inspector, stock chaser and time keeper. Her work ranged primarily from light, unskilled to sedentary, semiskilled, with the exception of the

---

[5] Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993). This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

stock chaser job, which "may have gone to medium, unskilled."

ALJ Berk asked VE Tripi to consider an individual of Plaintiff's age, education, and work experience who could perform work at the light exertional level, but was precluded from performing work that required repeated use of her hands (R. 263). VE Tripi testified that this hypothetical person could not perform Plaintiff's past relevant work because all of her past work required the repetitive bilateral use of her hands. Yet, VE Tripi indicated that Plaintiff could work as a machine tender, information clerk, security guard, order clerk, or gate community monitor. There were approximately 6,500 light exertional level jobs and 3,500 sedentary jobs available in the Detroit area that Plaintiff could perform (R. 263-264).

ALJ Berk then asked the VE to assume he found Plaintiff's testimony to be credible in all respects regarding pain limitations. VE Tripi stated that assuming Plaintiff's testimony was credible would preclude all competitive employment. The VE indicated that the preclusive factors were the pain in Plaintiff's upper extremities, as well as her need to rest intermittently during her normal waking hours.

### 5.  *The ALJ's Decision*

ALJ Berk found that Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of his decision (R. 36). He opined that Plaintiff met the disability insured requirements of the Act through the date of his decision, and that she had not engaged in substantial gainful activity since the alleged onset of disability (R. 35). Further, ALJ Berk found that Plaintiff had carpel tunnel syndrome and dysthymia. Yet, the severity of Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").

9

ALJ Berk found that Plaintiff retained a residual functional capacity (RFC) for a significant range of sedentary work, with only the following limitations: can lift and/or carry a maximum of 10 pounds occasionally and lesser weights frequently, can sit 6 of 8 hours in a typical work day, can stand or walk 2 of 8 hours in a typical workday.  Plaintiff is unable to use her hands on a repetitive basis.  ALJ Berk concluded that Plaintiff does not have any transferable skills that can be used for work within her residual functional capacity.

ALJ Berk found that Plaintiff's allegations regarding her limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective medical evidence, including the testimony at the hearing.  Although Plaintiff is treated for carpel tunnel syndrome, the ALJ noted that her conservative treatement belies disabling restrictions of her hands and/or upper extremities (R. 30).  Plaintiff only took aspirin and Motrin 3-4 times per week, and had not required physical therapy, steroid injections or carpel tunnel release surgery. While Plaintiff testified that Motrin upsets her stomach, the medical record does not show that Plaintiff complained of such side effects to her treating sources or requested alternative medication.  Plaintiff testified that she does not contemplate surgery for carpel tunnel syndrome because she was informed it would not help.  Yet, the medical record shows that Plaintiff was recommended surgery if conservative treatment failed.  The ALJ concluded that the fact that Plaintiff does not contemplate surgery suggests that conservative treatment is generally successful in controlling her symptoms (R. 31).  Moreover, the ALJ noted that the record reflects possible exaggeration by Plaintiff on the limitation of her hands.  During two evaluations, on February 22, 2002, and in March 2004, Dr. Rusko noted that Plaintiff had not given a full effort and had "grossly overacted" during examination.

10

The ALJ concluded that the record established that Plaintiff would not be precluded from lifting 10 pounds occasionally and lesser weight frequently.  The evidence did not support an inability to perform tasks requiring limited manipulation, and Plaintiff reported that she was able to drive, dress herself, and perform household activities, such as laundry, dusting and washing dishes.  While Dr. Taylor indicated that Plaintiff could not lift more than five pounds, the two sources more familiar with Plaintiff failed to indicate such extreme lifting restrictions.

Plaintiff complained of back pain and problems with her knees.  Yet, she did not describe any specific limitations with her knees and the record does not document any complaints of back pain to treating or examining sources (R. 32).  In addition, arthritis or other impairments of the knees had not been verified by x-ray or other objective testing.

Plaintiff also complained of poor sleep due to numbness of the hands.  There is little mention of this difficulty listed in the medical documentation and no suggestion from a treating physician that Plaintiff would be unable to work as a result of sleep problems.

Plaintiff testified that she experiences depression with periodic crying spells.  The ALJ noted that the course of treatment pursued by Plaintiff was not "consistent with what one would expect if the claimant was truly disabled."  The medical record documents no psychiatric, psychological or counseling treatment, nor does it document any hospitalization or emergency room treatment for a mental impairment since June 2003.  In addition, the clinical findings from the mental status evaluations fail to indicate a disabling mental impairment even during that period of time she was seeking treatment (R. 33).  Thus, the ALJ concluded that Plaintiff was capable of performing the usual "cognitive aspects of unskilled vocational functioning."

11

**II.**   **ANALYSIS**

**A.**   **Standard Of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

12

Plaintiff can perform.

**B.**   **Factual Analysis**

In her motion for summary judgment Plaintiff argues that ALJ Berk erred as follows: (1.) by employing the incorrect Grid rule as a decision-making framework and (2.) improperly assessing the credibility of Plaintiff's complaints of pain and limitations.

**1.**   ***The Proper Grid Rule***

Plaintiff argues that the ALJ employed the wrong Grid rule as a framework for decision-making.  Here, the ALJ employed Grid Rule 201.21 as a framework for his decision (R. 36).  Rule 201.21 applies to a person aged 45-49, who is a high school graduate, with no transferable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1 at 201.21 ("Grid Rule 201.21").  Plaintiff contends that the ALJ should have used Grid Rule 201.14.  Yet, Rule 201.14 is only properly applied to individuals "closely approaching advanced age." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1.  The regulations define "Individuals approaching advanced age" as being 50 to 54 years old. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(g).  It is undisputed that Plaintiff was born on March 31, 1956, and was 49 years old through the date of the ALJ's decision (R. 27, 253).  She did not turn 50 until March 2006, over six months after the ALJ's decision.[7]

Plaintiff further argues that pursuant to the regulations, a finding of disability is

_____

[7] Plaintiff cites *Krupa v. Commissioner of Social Security*, 366 F. Supp. 2d 513 (E.D. Mich. 2005), in support of her contention that a finding of disabled is directed by the regulations. Yet, in *Krupa* the plaintiff was over fifty at the time of the last administrative hearing, had a high school education, and according to the ALJ his prior work skills were not transferable.  Thus, in that case, Grid Rule 201.14 was the correct rule to apply.  *See, Id.* at 518.

warranted for a person aged 45 to 49 years old, if they are restricted to sedentary work, unskilled

or without transferable skills, unable to perform past relevant work, and either illiterate or unable

to communicate in English (Dkt. #12 at 6, FN 1, citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, §

201.00(h)).  Yet, this regulation clearly requires that the individual in question either be illiterate

or unable to communicate in English.  Here, Plaintiff testified to graduating from high school,

and has never alleged an inability to read or write (R. 83).  Hence, this regulation is inapplicable.

*See also* 20 C.F.R. § 404.1564(b)(4) (providing that an individual with a high-school education

is generally considered to be able to perform semi-skilled through skilled work).

When a claimant is on the threshold of the next age category, the ALJ has the discretion

to apply a different Grid rule, if it is thought necessary to do so, but is not obligated to do so.

*Crady v. Sec'y of Health & Human Servs*., 835 F.2d 617, 622 (6th Cir. 1987) ("The fact that age

categories are not to be applied mechanically, however, obviously does not mean that a claimant

must be moved mechanically to the next age category whenever his chronological age is close to

that category.").  Therefore, contrary to Plaintiff's assertions, it was appropriate for the ALJ to

use Rule 201.21 as a decision-making framework.

### 2.    *Medical Evidence and Plaintiff's Credibility*

Plaintiff claims that the ALJ improperly assessed her credibility and as a result failed to

adequately support his decision with substantial evidence.  Specifically, Plaintiff argues that ALJ

failed to properly consider her asserted problems sitting, standing, sleeping at night, numbness in

her hands and daily napping.  Subjective evidence is only considered to "the extent...[it] can

reasonably be accepted as consistent with the objective medical evidence and other evidence (20

C.F.R. 404.1529(a))"  *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852

14

(1986).  While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, (*Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*,  336 F.3d 469, 476 (6th Cir. 2003), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan,* 801 F.2d at 852.  While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence.  Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain.  Section 404.1529(c)(2),11  29 C.F.R. § 404.1529(c)(2) states:

> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

 *See also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

Yet, in determining the existence of substantial evidence, it is not the function of the federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In *Jones* the Court noted that an ALJ can

15

reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained. *Jones,* 336 F.3d at 476.

In this case, the ALJ's decision is supported by substantial evidence. While EMG studies from December 2000, March 2002, and March 2004 all consistently demonstrate the existence of carpal tunnel syndrome (R. 142, 146, 227), Plaintiff also demonstrated normal muscle strength, and full range of motion in her hands and arms (R. 222). Moreover, during numerous examinations, her responses to grip strength and range of motion tests in her wrists were described as "variable" (R. 150), lacking full effort (R. 152), and in March 2004, as being a "gross over-reaction" (R. 232). These tests fail to support Plaintiff's claims that she could not turn a faucet, or that her hand numbness or weakness prevented her from working at all.

Dr. Rusko, Plaintiff's hand surgeon and reconstructive specialist, opined in March 2002 that Plaintiff could "return to light work with the avoidance of any heavy pulling, pushing or lifting and also the avoidance of vibratory tools. It would also be recommended that the patient use protective wrist splints" (R. 147). In March 2004, after ordering and reviewing a third EMG study, Dr. Rusko opined that Plaintiff could return to work using wrist splints, no heavy lifting, pushing, pulling or use of vibrating tools (R. 234). These limitations are fully consistent with the ALJ's finding that Plaintiff was limited to sedentary work with no repetitive use of her hands.

Similarly, the findings of Dr. Taylor, an orthopedist who examined Plaintiff in November 2004, include a limitation to light work that did not require repetitive or forceful grasping, pushing, pulling, twisting, or use of vibrating tools, or lifting more than five pounds in either hand (R. 242). While Dr. Taylor indicated that Plaintiff could not lift more than five pounds and

16

the ALJ indicated that Plaintiff could lift 10 pounds occasionally and less weight frequently, the ALJ justified his decision by explaining that the two sources more familiar with Plaintiff failed to indicate such extreme lifting restrictions in their findings.[8]  Dr. Taylor's limitations are also consistent with the ALJ's conclusion that Plaintiff could perform a limited range of sedentary work. 20 C.F.R. § 404.1567(a).

Finally, the state agency reviewing physician concluded that Plaintiff retained the ability to perform light work, limited to occasional postural limitations, and no concentrated exposure to vibration (R. 114-20).  These findings are also consistent with the ALJ's findings.  Indeed, the ALJ gave Plaintiff a more conservative RFC by limiting Plaintiff to a range of sedentary work.

In sum, there were no opinions in the medical record before the ALJ, which contradicted his findings.  Dr. Little, Plaintiff's orthopedist, consistently cautioned her against repetitive use of her hands (R. 206, 207, 209, 218), a limitation the ALJ adopted.  Dr. Little also provided permanent restrictions against data entry, use of vibrating tools, working without splints, heavy lifting and more than minimal driving (R. 194, 199, 200).  These limitations are also consistent with the ALJ's determination.  To the contrary, however, Dr. Little did provide in November 2005, a letter to the Appeals Counsel that Plaintiff's condition had grown progressively worse and that she would never return to gainful employment (R. 244).  Yet, this is an opinion of

---

[8] Although the ALJ does not name the two familiar sources, it is assumed he is referring to Dr. Rusko, Plaintiff's hand surgeon, and Dr. Little, Plaintiff's orthopedist.  Dr. Little's statement that Plaintiff was unable to work was not made until after the ALJ issued his decision and was therefore not in the record before him.  Moreover, as discussed *supra*, Dr. Little's letter is an opinion of disability, which is an issue reserved to the Commissioner, and therefore one that the ALJ was not obligated to follow. 20 C.F.R. § 404.1527(e)(1).  Therefore, the ALJ's statement that no other source indicated such extreme lifting restrictions in their findings was accurate given the record before him.

disability, which is an issue reserved to the Commissioner, and therefore one that the Appeals Council or the ALJ was not obligated to consider had it been in the medical record before him. 20 C.F.R. § 404.1527(e)(1).  *See also*, *Cohen v. Sec'y of HHS*, 964 F.2d 524, 528 (6th Cir. 1992) ("The ALJ, however, is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Moreover, when there is a "battle of experts" with opinions in conflict, reviewing courts should generally defer to the factual determination of the administrative agency to which Congress had delegated such fact finding authority.  Under 42 U.S.C. 405(g), Congress has limited federal court's authority in disability reviews, and if substantial evidence supports the ALJ's decision, as it does in this case with several medical sources supporting the ALJ's finding, it must be affirmed – even if substantial evidence also supports the opposite conclusion, and even if this Court would have reached a different conclusion.  *See Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir. 2001)(substantial evidence standard encompasses a "zone of choice" within which the Commissioner can act without court interference (internal citations omitted)).

With regards to Plaintiff's  claims of depression, the findings of Plaintiff's treating psychiatrists consistently demonstrated moderately high GAF scores and only mild impairments in her functioning (R. 174, 187).  Plaintiff consistently failed to demonstrate any impairment at all in her ability to concentrate or pay attention (R. 176, 181-82, 183).  By July 2003, Plaintiff was responding well to medication, without side effects, and her treating psychiatrist concluded that her low-grade dysphoria was slowly resolving (R. 173).  These findings do not support Plaintiff's claims that she is disabled due to mental limitations.

Plaintiff also claimed that her need to nap every day, and her disabling pain in her upper

18

extremities would preclude her entirely from working.  The ALJ justifiably gave little weight to these allegations, given the above evidence.   No physician of record indicated that Plaintiff had a physical or mental need to nap every day.  Further, the ALJ considered the fact that Plaintiff was only taking Motrin and aspirin for pain in her hands (R. 255), which did not conform to her claims of disabling pain. *See, Villarreal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 464 (6th Cir. 1987) (noting that use of mild medication is not indicative of severe, disabling symptoms).

Finally, the ALJ's RFC assessment largely accommodated Plaintiff's complaints, and only disregarded her need for daily naps, which was entirely unsupported.  ALJ Berk asked VE Tripi to consider an individual of Plaintiff's age, education, and work experience who could perform work at the light exertional level, but was precluded from performing work that required repeated use of her hands (R. 263).  VE Tripi indicated jobs at both the light and sedentary level, which included work as a machine tender, information clerk, security guard, order clerk, or gate community monitor.  There were approximately 3,500 sedentary jobs available in the Detroit area that Plaintiff could perform and 7,000 such sedentary jobs in the state (R. 263-264).

## III.    EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

Plaintiff introduces evidence submitted first to the Appeals Council, but does not make an argument for remand based on this "new" evidence.  Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only if the party seeking remand shows that the new evidence is material.  In this case, Plaintiff has not provided this

Court with an argument for a sentence six remand.  Nor is it evident that this evidence warrants a remand under sentence six of § 405(g).  The November 2005 opinion of Dr. Little that Plaintiff was not employable is a conclusory statement on disability that the ALJ was not obligated to accept as binding.

This Court need only consider issues that have been fully developed by the briefs or in the record.  Issues that are adverted to in a perfunctory manner without some effort to develop an argument related to them are generally deemed waived.  *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002).  Further, "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . .  put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997).  Therefore, there is no basis for this court to order a remand based on this evidence first presented to the Appeals Council.

## IV.   RECOMMENDATION

For the above stated reasons, the ALJ's decision is supported by substantial evidence.  Accordingly, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the Commissioner's motion for summary judgement **GRANTED.**  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.

Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit

Fed'n of Teachers Local, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

　　　　Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


Dated: April 30, 2007                                    s/Steven D. Pepe
Flint, Michigan                                          United States Magistrate Judge



<u>CERTIFICATE OF SERVICE</u>

　　　　I hereby certify that on <u>DATE</u>, I electronically filed the foregoing paper with the Clerk
Court using the ECF system which will send electronic notification to the following: <u>Gad L.
Holland, James A. Brunson, AUSA,</u>  and I hereby certify that I have mailed by United States
Postal Service the paper to the following non-ECF participants: <u>Social Security Administration -
Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

　　　　　　　　　　　　　　　　　　　　s/ James P. Peltier
　　　　　　　　　　　　　　　　　　　　James P. Peltier
　　　　　　　　　　　　　　　　　　　　Courtroom Deputy Clerk
　　　　　　　　　　　　　　　　　　　　U.S. District Court
　　　　　　　　　　　　　　　　　　　　600 Church St.
　　　　　　　　　　　　　　　　　　　　Flint, MI 48502
　　　　　　　　　　　　　　　　　　　　810-341-7850
　　　　　　　　　　　　　　　　　　　　pete_peliter@mied.uscourts.gov